1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JULIAN SEGOBIA,

                              Plaintiff,

v.

ANDREW SAUL, Commissioner of the
Social Security Administration,

                              Defendant.

Case No.:  19cv1661-NLS

**ORDER:**

**(1) DENYING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT AND MOTION FOR
REMAND [ECF No.12]; and**

**(2) GRANTING DEFENDANT'S
CROSS MOTION FOR SUMMARY
JUDGMENT [ECF No. 16]**

    Julian Segobia II ("Plaintiff") brings this action under the Social Security Act, 42
U.S.C. § 405(g), seeking judicial review of the Social Security Administration's
("Defendant") final decision denying his claim for disability insurance benefits.  ECF No.
1.  The parties consented to proceed before a magistrate judge.  ECF No. 5; *see* 28 U.S.C.
§ 636(c)(1).  After considering the papers submitted, the administrative record, and the
applicable law, the Court **DENIES** Plaintiff's motion for summary judgment and
**GRANTS** Defendant's motion for summary judgement. The administrative law judge's
decision is **AFFIRMED**.  The Clerk is directed to enter judgment in favor of Defendant

and against Plaintiff, and to close the docket.

I. **BACKGROUND**

### A.   Procedural History

On January 9, 2017, Plaintiff filed a Title II and XVI application for Social Security Disability Insurance and supplemental security income, alleging a disability onset date of April 2, 2014.  Administrative Record ("AR") 21.  The Commissioner denied Plaintiff's claims initially on May 26, 2017, and on reconsideration on August 8, 2017.  *Id.*  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 1, 2018.  *Id.*  Plaintiff was represented by counsel at the hearing.  *Id.*  Plaintiff and vocational expert, Alan Boroskin, testified at the hearing. *Id.*

On October 22, 2018, the ALJ issued a decision denying Plaintiff's request for benefits, finding that Plaintiff had not been under a disability within the meaning of the Social Security Act from April 2, 2014, through the date of the decision.  AR 21-31. Plaintiff filed a Request for Reconsideration on November 21, 2018.  AR 302-04.  On July 23, 2019, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for judicial review purposes.  AR 1-6.  Plaintiff timely commenced this action in federal court.

### B.   Plaintiff's Background and Testimony

Plaintiff was born on November 2, 1986.  AR 29.  At the time of the hearing, he lived with his mother and was unemployed.  AR 194.  Plaintiff also received a college degree from the University of California, Irvine.  AR 844.  His hobbies and activities include skateboarding and reading spiritual books.  AR 199.  He testified that he performs chores such as washing dishes, vacuuming, and cleaning the patio of his home.  *Id.*  He also stated that he cooks (AR 200) and drives his mother's car (AR 194).

In 2012, Plaintiff was diagnosed with Schizophrenia.  AR 193, 195.  Following his diagnosis, Plaintiff held a series of jobs including working as a tutor for high school students, a valet, and a Ski lift operator in Lake Tahoe.  AR 195.  But none of these jobs

19cv1661-NLS

lasted longer than six months.  *Id.*  Plaintiff testified that he had never been fired from a job and he left each job willingly.  AR 197.  Although the reasons for leaving each job varied, Plaintiff testified that the pressure and mental difficulty of working made it hard for him to sustain work.  AR 195.  One such instance was while Plaintiff worked as a lift operator in Lake Tahoe.  AR 196.  He stated that the job was mentally difficult, physically demanding, and frustrating, and that these conditions took a mental toll on him.  *Id.*

Plaintiff testified that he believes he is unable to work full time, stating that he had tried working full time before, but it "never worked out for one reason or another."  AR 197.  Plaintiff attributes his inability to work to psychological difficulties.  *Id.*  In particular, he asserts that he has trouble interacting with people and maintaining positive relationships with coworkers.  *Id.*  Outside of the work context, Plaintiff testified that he had difficulty talking to people and getting along with them, even in the public setting.  AR 198.  He further stated that he had no friends and does not participate in any group activities.  AR 199.  He testified that the only people he maintains regular contact with, aside from his mother, are his aunt and grandmother.  AR 198-99.

In terms of his ability to focus, Plaintiff stated that he had difficulties focusing sometimes.  AR 200.  He asserted that it varied from time to time, and that he meditated to help with his focus.  *Id.*

### C.    Documentary Medical Evidence

The earliest mention of Schizophrenia in Plaintiff's medical records before the court was in 2011, when he was hospitalized for giving away all his belongings as a result of his condition.  AR 1099, 1108.  Then, in 2012, Plaintiff was hospitalized again for wandering around San Diego "aimlessly."  AR 1099.  In August 2012, Plaintiff began treatment with Dr. Joanna Jadwiga Palica.  AR 1084.  To manage his condition Plaintiff received injections of Prolixin D, fluphenazine decanoate, every 2 weeks.  *See, e.g.*, AR 1084, 1099.  In October 2013, Plaintiff was noted to not be compliant with his oral regimen and had his dose of Prolixin D raised from 25mg to 37.5mg.  AR 907-08.

Between May 2013 and August 2017, Plaintiff received treatment primarily from two different locations, the Kaiser Permanente Canyon Crest Medical Office (Canyon Crest) in Riverside (*e.g.*, AR 938), and the Kaiser Permanente Bostonia Medical Office (Bostonia) in the San Diego area (*e.g.*, AR 925).  Plaintiff switched between these locations at least nine different times over the course of four years, going to Canyon Crest when he lived with his aunt and Bostonia when he lived with his mother.  AR 925, 932. These relocations occurred in part due to either tension with his mother or aunt (AR 877, 836), or a desire to seek work in a different location (AR 889).  Between December 2015 and March 2016, Plaintiff relocated to Lake Tahoe to pursue work and received injections at a local clinic.  AR 822, 828.  Because of Plaintiff's relocations, he was seen on and off by several treating physicians.

Plaintiff's treatment notes for his injections from both locations consistently described him as bright and cooperative, his affect as happy with congruent attitude, that he was friendly and engaging, and that he was well groomed, articulate, and conversant. *E.g.*, AR 795, 828, 832, 931.  Plaintiff's speech, movement, and grooming were noted as unremarkable on multiple occasions, and he was described as alert, oriented, calm and cooperative frequently.  *E.g.*, AR 876, 924, 936.  Moreover, his thoughts were described as logical, organized and reality based, and it was noted that he demonstrated insight into the relationship between medication compliance and decreased symptoms.  *E.g.*, AR 821, 846, 910.  Plaintiff additionally, denied any suicidal or homicidal ideations, auditory/visual hallucinations, or paranoia in every injection visit.  *E.g.*, AR 798, 810, 820, 842, 939.  On several occasions, Plaintiff reported his "medication helps," his "symptoms have remained in good control," and that "he is doing better than ever and in good control."  AR 804, 910, 916.

### i.      Joanna Jadwiga Palica MD- Treating Physician

#### a.   Treatment Notes

Plaintiff has been in Dr. Palica's care since April 2012.  AR 1099.  The earliest treatment note in the record though is from May 2013.  AR 925.  In this appointment,

Plaintiff reported he was "fine", but he just could not remember. *Id.* In his review of systems, Plaintiff was positive for hallucinations and his psychiatric exam noted his affect was inappropriate and he exhibited disordered thought content and abnormal new learning ability. AR 927. Dr. Palica also conducted a Mental Status Exam ("MSE"), where she noted:

- General: looking stated age, good grooming, fair eye contact
- Behavior: pleasant, cooperative
- Alert and oriented x 3
- Speech- normal rate and tone, normal volume normal articulation
- Attention span and concentration: mostly able to focus on conversation
- Affect- limited Mood-OK
- Thought process: vague, answers questions
- Thought contents. Perceptual disturbances: no suicidal ideations, no homicidal ideations, no auditory, visual, olfactory, or tactile hallucinations, no paranoid ideation's or ideas or reference, no thought insertion, no thought control, no thought withdrawal or thought broadcasting, negative symptoms, preoccupation.
- Motor - some psychomotor retardation
- Insight: poor, judgement: poor
- Gait: normal

*Id*. In the assessment portion of her treatment notes, she reported that Plaintiff had been treated successfully with Prolixin, that he was doing fairly well, and that he was not a safety concern. AR 928.

Plaintiff's August 2013 meeting with Dr. Palica was largely consistent with his previous appointment. He reported that he "felt good," had "no complaints," and had no paranoid ideations, hallucinations, or homicidal or suicidal ideations. AR 911. In his review of systems, he was noted to be positive for hallucinations, his affect was noted as

19cv1661-NLS

inappropriate, and he was described as exhibiting disordered thought content and abnormal new learning ability. AR 912. But, his MSE and assessment were the same as his previous appointment. AR 912-13.

On Plaintiff's November 2013 meeting with Dr. Palica, he reported he was doing well, that he was tutoring high school students in history, math, and English, had no symptoms, and was getting along with his mother fine. AR 904. Dr. Palica noted that Plaintiff's energy level was "perfect," his thinking was fine, and he had no psychosis. *Id.* Plaintiff's review of systems and MSE remained the same as his previous visit, except for an improvement in his thought process to "less vague." AR 905. Dr. Palica also wrote in her assessment that Plaintiff was doing "fairly well" and had "improved insight." *Id.*

Plaintiff did not show up for his January 2014 appointment, because he was unable to borrow his mother's car. AR 898. But on Plaintiff's March 2014 appointment, he reported he was "fine," that the children he tutored challenged him a lot, and that living with his mother was "ok." AR 894. Plaintiff's mood was described as content and he was noted as having no auditory hallucinations. *Id.* His review of systems omitted any notation of hallucinations or inappropriate affect, unlike his previous appointments. *Id.* Plaintiff's MSE also improved in several areas. AR 894-95. His affect changed from "limited" to "full range," his thought process was described as "more organized," he was noted to have no more psychomotor retardation, and his insight and judgement improved from poor to fair. *Id.*

On his October 2014 appointment, Plaintiff reported that he wanted to be more active with people. AR 873. Dr. Palica wrote that he had no psychosis and on his Brief Psychiatric Rating Scale (BPRS) he received a score of 20/126, noting only a mild impairment in his affect. AR 874. Plaintiff's MSE and assessment were the same as his previous appointment, except with an addition in his assessment that he was "currently stable". AR 874-75.

On Plaintiff's November 2014 appointment, he reported having no symptoms and hearing no voices. AR 870. He felt that his thought process was clear and recognized

that he used to have lots of paranoid ideations.  *Id.*  He related that he was "bummed" about not having a job and having no money.  *Id.*  In his BPRS, he was noted to have mild anxiety and depressive mood, and very mild emotional withdrawal, tension, and suspiciousness.  AR 870-71.  In his review of systems, his affect was noted as inappropriate.  AR 871.  But his MSE remained the same, aside from his affect being described as "odd."  *Id.*

Plaintiff reported that he was "ok" and denied any psychosis or auditory hallucinations on his February 2015 examination.  AR 854-55.  Dr. Palica described the status of Plaintiff's condition as "stable/unchanged" and noted his condition was "well controlled."  *Id.*  In his review of systems, Dr. Palica wrote Plaintiff was negative for hallucinations, and his MSE and assessment remained the same as his previous appointment. AR 855-56.

On Plaintiff's July 2015 appointment, he reported "I am good, I guess" and told Dr. Palica he had problems with money and that he could not hold a job.  AR 843-44.  Dr. Palica noted that he continued to have a hard time engaging in meaningful activities, and that he had paranoid ideations at times.  *Id.*  The status of Plaintiff's condition was changed to "mild/mod exacerbation," but in his review of systems Dr. Palica wrote he was negative for hallucinations.  *Id.*  Plaintiff's MSE and assessment remained the same as his previous appointments.  AR 844-45.  At his December 2015 appointment, Dr. Palica described Plaintiff as "mostly stable" and "able to cope with normal life stressors." AR 830.  Plaintiff's status was reported as "stable/unchanged" and his MSE was mostly the same, except for a change in his thought process which noted "organized."  AR 831.

After this point, the record is devoid of Dr. Palica's treatment notes until August 2018.  Dr. Palica's treatment notes show that Plaintiff met with Dr. Palica seven times between September 2017 and May 2018, but those treatment notes were not included in the record.  AR 81.  In this appointment, Plaintiff received a score of 0 in his PHQ-9 and GAD-7, suggesting no depression or anxiety.  AR 78.  Additionally, he received a score of 3 out of 100 in his Behavioral Health Impairment (BHI) severity score, demonstrating

19cv1661-NLS

low behavioral impairment.  AR 79, 82.  In his review of symptoms, Plaintiff was "positive for hallucinations" and described as exhibiting disordered thought content.  AR 79-80.  Plaintiff's MSE was largely consistent with his previous appointments, except his thought process was described as having "some poverty, hard time articulating what he feels," and his insight and judgement were evaluated as "poor."  AR 80.  But his TPI showed that he was getting along emotionally "very well" and that he was able to manage his day-today life "very well."  AR 82.

In September 2018, Plaintiff came in for a follow up appointment after an urgent visit earlier in the month, where his mother reported he had a relapse in his paranoid ideations.  AR 107-108.  In this appointment, Plaintiff related that he was "freaking out" and paranoid about people watching him.  AR 120.  Plaintiff believed that someone had hacked into his phone and became afraid of his neighbor who always yelled on the phone.  *Id.*  Plaintiff's mother also reported that he became extremely paranoid about being monitored and turned their television around to face the wall, disabled their internet service, and placed tape over the lens of a computer's camera.  *Id.*  Dr. Palica noted Plaintiff's status was "stable/unchanged," he was positive for hallucinations, and exhibited disordered thought content and abnormal new learning ability.  AR 121.  Plaintiff's MSEs were largely the same as his previous appointment with his affect changed to "odd, inappropriate" and his mood described as "unsure." AR 121-22. In her assessment, she noted that Plaintiff was more psychotic and that he needed closer follow up.  AR 122.

b.  Medical Opinion

In August 2018, Dr. Palica filled out a mental residual functional capacity assessment.  AR 1137.  In her assessment of Plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaptation, she noted moderate to marked limitations.  AR 1137-38.  From the legible portions of Dr. Palica's explanation, she noted that Plaintiff had difficulty keeping a job due to his condition.  AR 1139.  In particular, she wrote that Plaintiff quickly gets paranoid around people, gets

overwhelmed, and usually quits/walks out. *Id.* She also noted that Plaintiff often lost track of time and got distracted, and heavily relied on his mother to manage his care. *Id.*

### ii.    Evan George Tzakis M.D. – Treating Physician

While the record does not provide us when Dr. Tzakis first met with Plaintiff, the record shows that Dr. Tzakis began treating Plaintiff as early as April 2013. AR 937. In this medication check appointment, Plaintiff's aunt noted that he was "doing better," and starting to do more chores around the house. *Id.* Dr. Tzakis also performed an MSE, where he noted:

- Grooming: fair
- Attitude: Cooperative Motor activity: normal, no tremors, no tardive dyskinea evident
- Mood: euthymic
- Affect: normal range, appropriate, mood congruent
- Speech: normal
- Thought process: coherent, relevant, logical
- Thought process/ perpetual disturbances: no suicidal ideation, plan or intent, no homicidal ideation, plan or intent, no florid psychotic or inappropriate thought content.

*Id.*

At his July 2014 appointment, Plaintiff's aunt confirmed that he was doing well on his bimonthly injections. AR. 883. Plaintiff also reported working full time at an Amazon warehouse and related that he skateboarded, socialized with his cousin, played video games and did some chores. *Id.* Dr. Tzakis' MSE was largely the same as his previous, except under attitude, Plaintiff was noted as "cooperative. Dr. Tzakis also reported that Plaintiff was stable. AR. 884.

At Plaintiff's next appointment in March 2016, Plaintiff reported that he had fun socializing with people while he was working at Lake Tahoe and "[grew] as a person."

AR 822.  Plaintiff also told Dr. Tzakis that he believed the only medication he needed was the Prolixin D.  *Id.*  Plaintiff's MSE was largely the same as his last MSE, except that his attitude was described as "cooperative, casual," his mood was noted as "good," and his affect was reported as "bright."  *Id.*  Dr. Tzakis wrote Plaintiff was stable and to continue the same medication.  *Id.*

At his September 2016 appointment, Plaintiff told Dr. Tzakis he wanted to get disability benefits because he wanted the income and could not keep a job for more than a few months.  AR 811.  Plaintiff related he got "dissatisfied" and explained that there were "no jobs I would stick with."  *Id.*  Plaintiff also noted that his Prolixin D injections "seems to work" and "it keeps me stable."  *Id.*  Plaintiff denied any side effects and wanted to continue unchanged.  *Id.*  Plaintiff's MSE on this visit was consistent with his previous MSEs with his attitude described as "cooperative" and his mood noted as euthymic.  *Id.*  In his assessment, Dr. Tzakis wrote that "negative symptoms of schizophrenia seem to be interfering with maintaining gainful employment" and "patient is encouraged to apply for SSI."  AR 812.

### iii.    Christopher Lawrence Rodrigo Mft – Therapist

The record also shows that Plaintiff met with Mr. Rodrigo on four occasions from 2013 to 2015 for psychotherapy treatment. AR 836, 932. While the record is unclear as to when Plaintiff's first visit was, the earliest in the record is on May 2013.  AR 932.  In this appointment he reported that "I am doing really good."  *Id.*  Plaintiff reported that there was "a lot of tension at his aunt's home" and discussed relocating to the San Diego area to be with his mother.  *Id.*  Mr. Rodrigo wrote that Plaintiff presented with "stable affect," and denied psychotic symptoms.  *Id.*  While there was mild vagueness, Plaintiff seemed overall symptom free.  *Id.*  In his MSE, Plaintiff was reported as:

- Grooming: good

- Behavior/ Manner: normal, cooperative

- Mood: euthymic, sustained emotion state

- Affect: normal range, appropriate, mood congruent

19cv1661-NLS

- Speech: normal

- Sensory and cognitive: alert, clear

- Thought process: coherent, relevant, logical

- Thought process/ perpetual disturbances: no suicidal ideation, plan or intent, no homicidal ideation, plan or intent, no psychotic or inappropriate thought content

AR 932.  In his assessment, Mr. Rodrigo noted Plaintiff's GAF score was 60-51, showing moderate difficulty in social, occupation, or school functioning.  AR 933.  He also noted that Plaintiff' progress toward functional goals was "excellent."  *Id.*

On July 2014, Plaintiff met with Mr. Rodrigo after returning to Riverside.  AR 884.  Plaintiff reported he was "doing well."  AR 885.  Plaintiff reported that he was hired at a new Amazon distribution center, worked a few hours a week at Pac Sun, and related well with other staff.  *Id.*  Mr. Rodrigo noted that Plaintiff endorsed a "stable mood," denied auditory hallucinations, and his thoughts were linear, and goal directed.  *Id.*  While Mr. Rodrigo noted that Plaintiff was somewhat defensive about his diagnosis, overall, he appeared to be functioning well.  *Id.*  Plaintiff's MSE was the same as his previous visit and his GAF score rose from 70-61, showing mild symptoms or some difficulty in social, occupation or school functioning.  *Id.*  Mr. Rodrigo also noted that Plaintiff had some meaningful social relationships, was generally functioning pretty well, and had made "good progress towards his functional goals.  *Id.*

At his September 2014 appointment, Plaintiff again reported feeling "really good."  AR 877.  Mr. Rodrigo wrote that Plaintiff endorsed euthymic mood, had a bright affect, denied psychotic symptoms, and had no auditory or visual hallucinations.  *Id.*  Plaintiff told Mr. Rodrigo he was moving back to San Diego because his aunt was selling her home and he felt his aunt was too negativistic.  *Id.*  He also reported that he quit his job at Amazon, because he felt it was too impersonal and preferred to work with the public.  *Id.*  Plaintiff's MSE and GAF core were the same as his previous visit.  AR 878.  Additionally, Mr. Rodrigo noted that Plaintiff had some meaningful social relationships, was generally functioning pretty well, and had made "good progress towards his

19cv1661-NLS

1  functional goals." *Id.*

2      At his last meeting on November 2015, Plaintiff reported "doing well" and "feeling

3  good." AR 836.  He denied any hallucinations and paranoia thus far and endorsed a

4  stable mood.  *Id.*  Plaintiff reported that he experienced a lot of conflict living with his

5  mother and was planning to live with his aunt.  *Id.*  He also felt it was "easier to make

6  friends in Riverside." *Id.*  He also reported he "is driving" and admitted that he benefits

7  from his medication." *Id.*  Plaintiff's MSE and GAF scores were the same as his previous

8  appointment.  AR 837.

9              **iv.    Michael Charles Steinweg L.C.S.W – Therapist**

10     Plaintiff met with Mr. Steinwig on three occasions for Psychotherapy between July

11 2013 and December of 2014.  At his first appointment in July 2013, Plaintiff reported he

12 was "doing well." AR 919.  Mr. Steinwig reported that Plaintiff had difficulty doing the

13 research for his plans and was very resistant to talking about his diagnosis.  *Id.*  Mr.

14 Steinwig also noted that Plaintiff "appear[ed] to function well, but [his] ability to

15 organize may be impaired." *Id.*  Mr. Steinwig rated Plaintiff's severity of symptoms as

16 "mild to moderate" and his GAF Score was 60-51, noting moderate symptoms or

17 moderate difficulty in social, occupational, or school functioning.  AR 920.

18     At patient's next appointment on August 2013, Plaintiff reported he was "doing

19 well. AR 915.  Mr. Steinwig noted Plaintiff "presents as lucid, goal-oriented, no

20 psychosis noted or reported.  *Id.*  He also wrote that Plaintiff was "clearly having

21 difficulty planning and finding info needed to make fully informed decisions." *Id.*  Mr.

22 Steinwig assessed Plaintiff's overall impairment and severity of symptom as mild to

23 moderate and rated plaintiff GAF score at 70-61 and 60-51, mild symptoms and moderate

24 symptoms, respectively.  AR 915-16.

25     On December 2013, Plaintiff met with Mr. Steinweg for the last time in the record.

26 AR. 900.  In this meeting, Mr. Steinwig described Plaintiff as clean and casually dressed,

27 euthymic, friendly and cooperative, and logical.  AR 901.  Plaintiff reported he was doing

28 very well and that he was tutoring for special needs kids.  *Id.*  He denied any psychotic

19cv1661-NLS

symptoms or mood problems and noted that he had no concerns with the increase in his Prolixin dosage. *Id.* Plaintiff also told Mr. Steinwig that he did not feel the need to come in regularly. *Id.* Mr. Steinwig noted Plaintiff's overall impairment as "mild" and that Plaintiff "denies" severity of symptoms. He rated Plaintiff's GAF score at 70-61, showing mild symptoms. *Id.*

### v.     Lisa Ann Martin Mft – Therapist

From January 2015 to March 2015 Plaintiff met with Ms. Martin for comprehensive care management (CCM) appointments. AR 861. These appointments began in response to phone calls by Plaintiff's mother in December 2014, where she grew concerned about Plaintiff's behavior. *Id.* She reported that Plaintiff was sleeping a lot, not motivated at all, did not want to look for a job, and had been running out of money. AR 868. In response, Dr. Palica recommended scheduling a crisis appointment with any available therapist and evaluate if Plaintiff was appropriate for CCM. *Id.*

At their first appointment on January 2015, Plaintiff reported that he wanted a job and had been unemployed. AR 861. They discussed managing work expectations, and how he could socialize better. *Id.* Under a description of Plaintiff's symptoms, Dr. Martin noted his concentration and memory were fair, he had no anxiety or depression, he had fair energy, no panic attacks, no suicidal or homicidal ideations, fair hygiene, fair decision making, and a denial of psychotic symptoms. *Id.* Dr. Martin also performed an MSE noting that Plaintiff was alert and oriented to person, place, and time, his cognitive processes were intact, his short-term memory was normal, his mood was bright, his affect was congruent with his mood, and his behavior was within normal limits. AR 861-62. Dr. Martin rated Plaintiff's overall impairment as moderate, and his severity of symptoms as "mild to moderate." AR 862. Plaintiff's GAF score was also 62. *Id.*

At his February 2015, Ms. Martin noted that Plaintiff's motivation had improved from the last session. AR 857. Plaintiff reported that he had been feeling more motivated and productive, because of their previous session. *Id.* Plaintiff also noted that he had visited his friends, went to the park and hung out, and was talking to more people.

19cv1661-NLS

AR 857-58.  Plaintiff also reported that his mother had been "getting off his case more" and that he had been doing more chores such as scrubbing floorboards and cabinets, doing dishes, and sweeping.  AR 857.  Plaintiff's MSE and description of symptoms were the same as his previous visit and Dr. Martin reported that Plaintiff's overall impairment and his severity of symptoms were "mild."  AR 858.  His GAF score rose to 63.  *Id.*

Finally, on Plaintiff's last appointment with Ms. Martin in March 2015, Plaintiff mentioned that his mother got frustrated with him several times because he procrastinated on tasks.  AR 852.  They discussed strategies to improve his procrastination and improving his sleep schedule.  *Id.*  Plaintiff's MSE and description of symptoms were the same as his previous appointment.  AR 852-53.  Again, Ms. Martin noted that his overall impairment and his severity of symptoms were mild and placed his GAF score at 65.  AR 853.  After this meeting, Plaintiff called in late March 2015 to cancel the CCM appointments.  AR 851.  He reported that he was doing well, and he did not feel that he needed the appointments anymore.  *Id.*

### vi.    Keith Allen Montgomery M.D.

Plaintiff met with Dr. Montgomery on October 2016.  AR 806.  In this appointment, Plaintiff was described as "doing well, no problems or concerns."  *Id.*  Plaintiff denied any anxiety, depression, manic symptoms, suicidal or homicidal ideations, hallucinations, or paranoia.  *Id.*  Plaintiff also denied significant stressors.  *Id.*  Dr. Montgomery performed an MSE noting that Plaintiff was alert and oriented as to time, person, and place, he was dressed appropriately and maintained good eye contact, he was cooperative, his mood was 'ok," his affect was euthymic constricted, his thought process was linear, logical, and goal direct, and his insight and judgement were fair and intact.  AR 806-07.  Plaintiff's GAF Score was 80.  AR 807.

### vii.    Vijay Chennamchetty M.D.

Between May 2017 and September 2017, Plaintiff was treated by the County of San Diego Mental Health Services.  AR 1096.  During his time there, Plaintiff met with Dr. Chennamchetty on three occasions.  At Plaintiff's first appointment in May 2017, he

denied having symptoms suggestive of psychosis and admitted being stable on his medication for the past 3-4 years.  AR 1105.  Although Plaintiff could not remember the details of his previous symptoms, he denied having any paranoia or anxiety since being on his medication.  AR 1108.  Dr. Chennamchetty noted that Plaintiff had limited insight, fair judgement, had poor memory, and was a poor historian.  *Id.*  Dr. Chennamchetty also wrote that the records indicated that Plaintiff's mother reported that he was hearing the neighbors "through the wall," hated the brand name Adidas because he thought they were bad, and had a delusional theme in which he would meditate with only a towel around him to get rid of things he believed were there.  *Id.*  Plaintiff's mother also reported that Plaintiff had a belief that something was in his bed, which led to breaking the mattress frame and throwing everything in his room.  *Id.*  Dr. Chennamchetty performed an MSE, which noted:

- Level of Consciousness: Alert

- Orientation: All Normal

- Appearance: Good Hygiene

- Speech: Normal

- Thought Process: Coherent

- Behavior: Cooperative

- Affect: Appropriate

- Intellect: Average

- Mood: Euthymic

- Memory: Poor Recent; Poor Remote

- Motor: Age Appropriate/ Normal

- Judgement: Fair

- Insight: Limited

AR 1129.  Dr. Chennamchetty also performed a psychiatric exam, which described Plaintiff as "cooperative, calm, jovial/cheerful, his thought processes were linear and goal

directed, he had no obvious delusions or hallucinations, his mood was "good" his affect was full mood congruent, his cognitive was unremarkable from the interview, and his insight and judgement were fair.  AR 1106.

Plaintiff was half an hour late for his next appointment on June 2017.  AR 1102. Again, in this appointment, Plaintiff denied any audio or visual hallucinations, paranoia, or unusual behavior, and Dr. Chennamchetty confirmed that Plaintiff was not depressed, excessively anxious, hypomanic, or actively psychotic on his visit.  *Id.*  Finally, Dr. Chennamchetty's Psychiatric exam showed no changes since Plaintiff's last appointment. AR 1103.

At his last appointment in July 2017, Plaintiff reported that he was "doing okay." AR 1099.  He arrived on time with his mother and they discussed changing Plaintiff's dosage. Plaintiff and his mother were reluctant to change his medication and he reported that his injections had been helping him.  *Id.*  He also denied any hallucinations, and Dr. Chennamchetty wrote that he did not have any paranoia or unusual behavior.  *Id*.  Dr. Chennamchetty also reported that Plaintiff was not depressed, excessively anxious, hypomanic, or actively psychotic.  *Id.*  Plaintiff's psychiatric exam also showed no change from his last appointment.  AR 1100.

### viii.   Delia E. Nieves-Arvelo M.D.

Plaintiff also met with Dr. Nieves-Arvelo in August 2017.  AR 1085.  In this appointment Plaintiff denied any depression, anxiety/panic, or psychosis.  *Id.*  Dr. Nieves-Arvelo also conducted an MSE, which described Plaintiff as:

- Appearance: cooperative, well groomed. Good eye contact

- Psychomotor activity: within normal limits

- Speech: normal rate, volume and tone

- Mood and affect: mood described as "good"

- Affect is full congruent with mood

- Thinking and perception: Goal direct. Denies suicidal/ homicidal ideas and/or auditory/visual hallucinations

19cv1661-NLS

- Sensorium/cognitive: alert and oriented as to person, time, and place. No cognitive deficit

- Insight: good

- Judgement: good

- Impulse control: good

AR 1088.  Additionally, Plaintiff's treatment notes show that his BHI was low and that he "strongly agrees" that his medication is helping.  AR 1090, 1092.

### ix.   Barbara Moura Psyd – State Agency Non-Examining Physician

In May 2017, Dr. Moura reviewed the medical records from Dr. Tzakis, Kaiser Permanente, and a third unknown author.  AR 207.  Dr. Moura summarized Plaintiff's MSEs as showing he was cooperative, pleasant, coherent, logical, his mood was ok, his affect was euthymic constricted and odd, he was able to focus, and his insight and judgement were fair.  AR 220.  She also noted that Plaintiff had reported his psychiatric symptoms had remained in good control between October 2016 and January 2017.  *Id.* While Dr. Moura acknowledged reports that Plaintiff's negative symptoms seemed to be interfering with his ability to maintain gainful employment and with daily function, Dr. Moura concluded this was not an ongoing complaint, because Plaintiff's medical records show mostly normal MSEs and overall stability.  *Id.*

In evaluating the severity of plaintiff's impairment, Dr. Moura concluded that under the Paragraph B criteria, plaintiff had a mild impairment in his ability to understand, remember, or apply information, and moderate impairments in his ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. AR 210.  In assessing Plaintiff's RFC, Dr. Moura found moderate limitations in the plaintiff's ability to 1) maintain attention and concentration for extended periods, 2) complete a normal workday and workweek without interruptions from psychologically based symptoms, 3) to interact appropriately with the general public, and 4) respond appropriately to changes in the work setting.  AR 212-213.  In all other areas, Dr. Moura opined Plaintiff was not significantly limited.  *Id.*  Finally, Dr. Moura opined that

19cv1661-NLS

Plaintiff could perform simple 1-2 step tasks with limited public contact.  AR 213.

### x.    Anna Franco PsyD – State Agency Non- Examining Physician Reconsideration

On reconsideration, Dr. Franco agreed with the prior conclusions that Plaintiff's condition was not severe.  AR 230-240.  While Dr. Franco listed out her findings in somewhat more detail, she reached the same conclusion that Plaintiff's MSE findings were stable, his symptoms were well maintained and controlled, and there were no overt symptoms of psychosis.  AR 232-234.  Dr. Franco's evaluation of the severity of Plaintiff's symptoms and his RFC were the same as Dr. Moura's.  AR 235-239.

### D.    Vocational Expert's Testimony

Vocational Expert ("VE") Alan Boroskin testified at the hearing.  AR 201. The ALJ confirmed if the VE's testimony was consistent with the DOT, specifically asking "[i]f your testimony is inconsistent with the DOT, will you tell me whether or not I ask." *Id.*  The VE responded in the affirmative.  *Id.*

Because Plaintiff had no past relevant work, the ALJ confined his inquiry to a series of hypotheticals.  *Id.*  Each of these hypotheticals assumed a hypothetical individual with Plaintiff's age, education, and experience, who has no exertional limitations, but with the following restrictions: limited to understanding, remembering, and carrying out simple, routine, and repetitive tasks, with the need for standard industry breaks every two hours; no interaction with the public; and occasional work related non-personal, non-social interaction with coworkers and supervisors involving no more than a brief exchange of information or hand-off of product. AR 201-03.

The ALJ first asked if there were any jobs that such an individual could perform.  AR 201-02.  The VE responded in the affirmative and offered examples from medium, light, or sedentary work styles.  AR 202.  The ALJ requested one example at light and one example at sedentary.  *Id.*  For the light exertional occupation, the VE gave the example of a photocopying machine operator, under general office machine operators, DOT # 207.685-014, with a national number of 266,000 for the broad category. Id. For

19cv1661-NLS

the sedentary exertional occupation, the VE gave the example of a packer, DOT # 558.687-014, with a national number of 87,100.  AR 203.

The ALJ presented the VE with another hypothetical, adding in the additional constraint that the individual would be off-task for one hour during the workday in addition to regular breaks.  *Id.*  The VE testified that he would not be able to perform these two jobs with this additional limitation, and that he would not be employable.  *Id.* The ALJ presented the VE with another hypothetical, adding that instead of the off-task limitation, the hypothetical individual would be unable to interact appropriately with supervisors and coworkers on a consistent basis.  *Id.*  The VE testified that Plaintiff could not perform any jobs under this constraint.  *Id.*

## II.   THE ALJ DECISION

### A.   The Sequential Process

To qualify for disability benefits under the Social Security Act, an applicant must show that he or she cannot engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least twelve months.  42 U.S.C. §§ 423(d), 1382c(a)(3).  The Social Security regulations establish a five-step sequential evaluation to determine whether an applicant is disabled under this standard.  20 C.F.R. §§ 404.1520(a), 416.920(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1194 (9th Cir. 2004).

At step one, the ALJ determines whether the applicant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(b).  If not, then at step two the ALJ must determine whether the applicant suffers from a severe impairment or a combination of impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(c).  If the impairment is severe, at step three the ALJ must determine whether the applicant's impairment or combination of impairments meets or equals an impairment contained under 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* §§ 404.1520(a)(4)(iii), 416.920(d).  If the applicant's impairment meets or equals a listing, he or she must be found disabled.  *Id.*

If the impairment does not meet or equal a listing, the ALJ must determine the

19cv1661-NLS

applicant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(e).  Then, the ALJ must determine at step four whether the applicant retains the residual functional capacity to perform past relevant work.  *Id.* §§ 404.1520(a)(4)(iv), 416.920(f).  If the applicant cannot perform past relevant work, at step five the ALJ must consider whether the applicant can perform any other work that exists in the national economy.  *Id.* §§ 404.1520(a)(4)(v), 416.920(g).

The applicant carries the burden to prove eligibility from steps one through four but the burden at step five is on the agency.  *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).  Applicants not disqualified at step five are eligible for disability benefits.  *Id.*

### B.    Substance of the ALJ's Decision

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since April 2, 2014, the alleged onset date.  AR 23.

At step two, the ALJ determined Plaintiff's schizoaffective disorder constituted a severe impairment.  AR 24.  In addition, the ALJ determined that Plaintiff's obesity was a nonsevere condition.  *Id*.

At step three, the ALJ found Plaintiff's mental impairment did not have an impairment or combination of impairments that would meet or medically equal the severity of any listed impairments.  *Id*.  The ALJ considered Paragraph B criteria and found that Plaintiff did not exhibit the requisite one extreme or two marked limitations.  *Id*.  Specifically, the ALJ found only: moderate limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; moderate limitation in adapting or managing himself.  AR 24-25.  In addition, the ALJ considered Paragraph C criteria and found that Plaintiff did not have only marginal adjustment.  AR 25.

The ALJ next established that Plaintiff retained the residual functional capacity to perform the full range of work at all exertional levels, but with the following nonexertional limitations: the claimant is limited to understand, remembering, and carrying out simple, routine, and repetitive tasks with standard industry work breaks

every two hours. The claimant must avoid interaction with the general public, and only occasionally engage in work-related, non-personal, non-social interaction with coworkers and supervisors involving no more than a brief exchange of information or hand-off of product.  AR 25.

At step four the ALJ determined there was no past relevant work.  AR 29. However, at step 5 the ALJ found that despite the nonexertional limitations, there were significant jobs in the economy that he could perform, including several specifically enumerated by the vocational expert.  *Id.*  The ALJ concluded Plaintiff was not under a disability as defined in the Social Security Act from April 22014, the alleged disability onset date, through October 22, 2018, the date of the decision.  AR 30-31.

### III.   Legal Standard of Review

The Social Security Act provides for judicial review of a final agency decision denying a claim for disability benefits. 42 U.S.C. § 405(g).  A reviewing court must affirm the denial of benefits if the agency's decision is supported by substantial evidence and applies the correct legal standards. *Batson*, 359 F.3d at 1193.  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (quotation and citation omitted).  It is a "highly deferential" standard of review. *Valentine v. Astrue*, 574 F.3d 685, 690 (9th Cir. 2009).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Vasquez v. Astrue*, 547 F.3d 1101, 1104 (9th Cir. 2008) (internal quotations and citation omitted).  If the evidence is susceptible to more than one reasonable interpretation, the agency's decision must be upheld. *Molina*, 674 F.3d at 1111.  It is not the Court's role to reinterpret or re-evaluate the evidence, even if a re-evaluation may reasonably result in a favorable outcome for the plaintiff. *Batson*, 359 F.3d at 1193.

### IV.   DISCUSSION

In challenging the ALJ's decision, Plaintiff argues that the ALJ committed reversible error by (1) failing to give clear and convincing reasons to discount the opinion

of Dr. Palica, a treating physician, (2) accepting and relying on VE testimony which was inconsistent with the DOT, (3) issuing an RFC that does not adequately address Plaintiff's limitations resulting from his condition, and (4) failing to consider the claimant's ability to sustain work.  The Court addresses each of these in turn below.

### A. The ALJ provided clear and convincing reasons for rejecting Dr. Palica's opinion

Plaintiff contends that the ALJ erred by failing to provide clear and convincing reasons supported by substantial evidence for assigning little weight to Dr. Palica's findings.  In particular, Plaintiff cites to several portions of the record to contend that Dr. Palica's opinion was consistent with the record as a whole and argues that the ALJ "cherry-picked" instances of improvement which were not representative of the Plaintiff's actual condition.  Upon the review of the ALJ's opinion and the record as a whole, the Court disagrees and finds that substantial evidence supports the ALJ's determination.

The Ninth Circuit distinguishes "among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non[-]examining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Courts "afford greater weight to a treating physician's opinion because he is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (internal quotations omitted).  "However, if a treating physician's opinion is not supported by the record, it may be disregarded."  *Oscar S. v. Berryhill*, No. 18CV1152-AJB(RBB), 2019 WL 2549249, at *5 (S.D. Cal. June 20, 2019), report and recommendation adopted sub nom. *Sanchez v. Berryhill*, No. 18-CV-1152-AJB-KSC, 2019 WL 5098876 (S.D. Cal. July 29, 2019).

Where a treating physician's opinion is not contradicted by another doctor, the ALJ can only reject the treating physician's opinion for "clear and convincing" reasons.

19cv1661-NLS

*Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017); *Lester*, 81 F.3d at 830. Where the treating physician is contradicted by another doctor, the ALJ "must determine credibility and resolve the conflict." *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002) (internal quotation marks omitted). The ALJ can "meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).

Here, Dr. Palica's opinion was uncontradicted.[1] Therefore, the ALJ must provide clear and convincing reasons supported by substantial evidence in order to properly assign "little weight" to Dr. Palica's opinion.

The ALJ discussed Dr. Palica's finding in his discussion of Plaintiff's RFC. AR 27-29. After providing a detailed account of why Plaintiff's subjective testimony was inconsistent with the record as a whole, the ALJ analyzed Dr. Palica's opinion. *Id.* Dr. Palica's opinion noted several "marked" or severe limitations in Plaintiff's ability to sustain concentration, accept instructions and criticism, maintain socially appropriate behavior, and respond appropriately to the work setting. AR 28,1136-39. The ALJ assigned little weight to Dr. Palica's opinion because the record as a whole did not support the Plaintiff's psychological limitations as Dr. Palica provided. AR 28. In

---

[1] For the purposes of review, the Court assumes Dr Palica's opinion was uncontradicted. While the Court notes that state agency medical consultants provided opinions which contradicted Dr. Palica's opinion, the ALJ did not mention or even cite to those opinions in his decision. In evaluating the ALJ's decision, the Court is constrained to review the reasons asserted by the ALJ and cannot uphold the ALJ's decision on grounds not asserted in the original opinion. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir.2003); *see Pinto v. Massanari*, 249 F.3d 840, 847–48 (9th Cir.2001) ("If the Commissioner's contention invites this court to affirm the denial of benefits on a ground not invoked by the Commissioner in denying the benefits originally, then we must decline."); *see also Bailey v. Colvin*, No. CV 14-2149-TUC-LAB, 2015 WL 3751138 (D. Ariz. June 16, 2015) (applying the clear and convincing standard, despite evidence in the record of contradicting opinions from State Agency medical consultants, because the ALJ did not rely on or mention the consultants' opinions in his decision); *Osborn v. Colvin*, 104 F. Supp. 3d 1104 (D. Or. 2015) (characterizing a treating physician's opinion as "uncontradicted" and applying the clear and convincing standard, where the ALJ's decision did not mention contrary opinion by state agency physicians).

supporting his conclusion, the ALJ specifically cites to two portions of the record that contradicted Dr. Palica's findings as to the severity of Plaintiff's limitations: 1) frequent instances where Plaintiff reported that his medication was helping manage his condition, and 2) the generally unremarkable findings of Plaintiff's MSEs. AR 28. Upon review of the record, the Court finds that these reasons are well-supported.

First, the ALJ specifically cited Plaintiff's December 2013 and September 2016 evaluations to support his finding that Plaintiff had often told treating sources that his medication was helping manage his condition. *Id.* In Plaintiff's December 2013 evaluation, he reported he was "doing very well," had no concerns with increasing his dose of Prolixin, and did not feel that he needed to come to psychotherapy regularly. Additionally, Plaintiff denied any severe symptoms and his overall impairment was described as mild. In his September 2016 evaluation, he reported that his injections "seems to work," "it keeps me stable," and wanted to continue his medication regimen unchanged.

Moreover, the ALJ provided additional evidence that Plaintiff's condition was being managed by his medication in his preceding discussion of Plaintiff's subjective symptoms.[2] *Id.* In the preceding section, the ALJ cited to Plaintiff's June and July 2017 evaluation, where he told Dr. Chennamchetty that he was "doing okay," that his Prolixin injections had been helping, and often denied experiencing negative symptoms. AR 27, 1099. The ALJ also cited to a report by Plaintiff's mother in May 2013 that his "behavior has improved significantly" with an increase in his medication (AR 934), and a CCM evaluation in February 2015 which noted that Plaintiff's "motivation improved from last session" (AR 861).

---

[2] The Court applies the evidence discussed in the preceding section to the ALJ's discussion of Dr. Palica's opinion for two reasons. First, the ALJ prefaced his discussion of the evidence with "[a]s mentioned before," signaling that the evidence discussed in the preceding section applied to his discussion of Dr. Palica's opinion. Second, in reading the opinion as a whole, it is a clear by the structure that the ALJ's discussion of the evidence for Dr. Palica's opinion was intrinsically linked to his discussion of Plaintiff's subjective testimony.

19cv1661-NLS

Plaintiff cites to *Garrison v. Colvin*, 759 F.3d 995, 1018 (9th Cir. 2014), to contend that it is error for an ALJ to pick out a few isolated instances of improvement and use those as the basis for determining a claimant capable of work.  In the present case, however, the instances chosen by the ALJ were in fact representative of the record as a whole, unlike the instances cited in *Garrison*.  *Id.*  Plaintiff reported that his medication helped and that his symptoms remain in good control on his May, August, and September 2013 and October 2016 appointments.  AR 804, 910, 916, 930.  Moreover, throughout the vast majority of his injection notes, medication appointments, and psychotherapy visits, Plaintiff denied hallucinations, paranoia, and other severe symptoms.  *E.g.*, AR 796, 844, 878-77, 889.  These included MSEs and assessments from Dr. Palica, Dr. Tzakis, and Mr. Rodrigo, which noted that Plaintiff denied hallucinations, paranoia, and psychosis.  *E.g.*, AR 822, 830, 836.  Significantly, in Plaintiff's May 2017 psychiatric assessment, Plaintiff reported being stable on Prolixin for the past 3 or 4 years and denied having any of his previous symptoms since being on his medication.  AR 1117.  All these instances demonstrate that Plaintiff consistently told treating sources that his medication was managing his condition and he denied experiencing severe symptoms, contradicting Dr. Palica's finding of a marked impairment.  *See Ford v. Colvin*, No. 2:13-CV-2245-EFB, 2015 WL 1291388, at *3 (E.D. Cal. Mar. 20, 2015) (finding treatment notes which reported that the plaintiff had been stable on medication was inconsistent with the treating physician's opinion that plaintiff had marked limitations).  Therefore, the Court finds substantial evidence supports the ALJ's determination that the efficacy of Plaintiff's medication did not support Dr. Palica's findings.

Second, the ALJ also pointed to the "generally unremarkable" findings of Plaintiff's MSEs. Though the ALJ did not specifically cite to exhibits in that portion of his decision, the ALJ made reference to a portion of his decision where he mentioned the unremarkable nature of Plaintiff's MSEs.  *Compare* AR 28 *with* AR 24-25.  In that portion of the opinion, the ALJ citied to Exhibits 2F, 3F, 4F, 6F, and 7F.  AR 24-25.  Moreover, the ALJ made specific citations to MSEs conducted by Dr. Tzakis, Mr.

Rodrigo, and Dr. Chennamchetty in his discussion of Plaintiff's testimony, which described Plaintiff's mood and affect as "euthymic," "bright," and "good."  AR 27.

In reviewing those exhibits, the Court finds that there is substantial evidence that supports the ALJ's interpretation of Plaintiff's MSEs.  For example, Dr. Palica's MSE on May 2013 reported:

- General: looking stated age, good grooming, fair eye contact
- Behavior: pleasant, cooperative
- Alert and oriented as to time, person, and place
- Speech- normal rate and tone, normal volume normal articulation
- Attention span and concentration: mostly able to focus on conversation
- Affect- limited Mood-OK
- Thought process: vague, answers questions
- Thought contents: no suicidal ideations, no homicidal ideations, no auditory, visual, olfactory, or withdrawal or thoughts broadcasting negative symptoms, preoccupation
- Motor - some psychomotor retardation
- Insight: poor, Judgement: poor

AR 927.  By Plaintiff's MSE on March 2014, Dr. Palica noted several improvements:

- General: looking stated age, good grooming, fair eye contact
- Behavior: pleasant, cooperative
- Alert and oriented x 3
- Speech- normal rate and tone, normal volume normal articulation
- Attention span and concentration: **able to focus on the conversation**
- Affect- limited Mood-OK
- Thought process: vague, answers questions
- Thought contents: no suicidal ideations, no homicidal ideations, no auditory, visual, olfactory, or withdrawal or thoughts broadcasting negative symptoms,

preoccupation

- Motor – **no more psychomotor retardation**
- Insight: **fair**, Judgement: **fair**

AR 894-95 (emphasis added).  These evaluations remained consistent throughout Dr. Palica's course of treatment with minor variations in his attention span and concentration, which included modifiers such as "less vague" or "more organized."  e.g.  AR 871, 905. While Plaintiff's insight and judgment did worsen to "poor" in his MSEs on August, September 2018, "poor" insight and judgement does not necessarily translate to severe impairments as Dr. Palica opined.  AR 80, 121.

Moreover, the MSEs by Plaintiff's other treating sources were also consistently unremarkable.  Dr. Tzakis' MSEs repeatedly reported:

- Grooming: fair
- Attitude: Cooperative Motor activity: normal, no tremors, no tardive dyskinea evident
- Mood: euthymic
- Affect: normal range, appropriate, mood congruent
- Speech: normal
- Thought process: coherent, relevant, logical
- Thought process/ perpetual disturbances: no suicidal ideation, plan or intent, no homicidal ideation, plan or intent, no florid psychotic or inappropriate thought content

AR 822.  Dr. Tzakis' MSEs only varied slightly including terms such as "superficial," "familiar," and "casual" in describing his attitude and "bright" in describing his affect. AR 822, 890, 937.  Mr. Rodrigo's MSEs mirrored Dr. Tzakis' results showing:

- Grooming: good
- Behavior/ Manner: normal, cooperative
- Mood: euthymic, sustained emotion state

19cv1661-NLS

- Affect: normal range, appropriate, mood congruent
- Speech: normal
- Sensory and cognitive: alert, clear
- Thought process: coherent, relevant, logical
- Thought process/ perpetual disturbances: no suicidal ideation, plan or intent, no homicidal ideation, plan or intent, no psychotic or inappropriate thought content

AR 885.  The MSEs from Ms. Martin (AR 858), Dr. Montgomery (AR 806-07), Dr. Chennamchetty (AR 1129), and Dr. Nieves-Arvalo (AR 1085) are all further consistent with these results, demonstrating a prolonged and consistent pattern of unremarkable results.  Significantly, Ms. Martin's MSEs noted Plaintiff's overall impairment and symptoms improved to "mild" in both categories after her first appointment with Plaintiff.  AR 853, 858.  Even Plaintiff's worst results—limited affect limited insight, poor judgement and insight (AR 80)—when viewed in context of his entire MSE, do not necessarily translate into the marked or severe impairments as opined by Dr. Palica. *Corthion v. Colvin*, No. CV-15-00837-PHX-GMS, 2017 WL 68910, at *4 (D. Ariz. Jan. 6, 2017), aff'd sub nom. *Corthion v. Berryhill*, 757 F. App'x 614 (9th Cir. 2019) (finding evidence that showed claimant's generally intact mental status was inconsistent with treating physician's opinion that claimant was severely impaired).  Therefore, the Court finds substantial evidence supporting the ALJ's assertion that Plaintiff's MSEs did not support Dr. Palica's findings.

Beyond these specific reasons given by the ALJ, inconsistencies with the record as a whole can be a clear and convincing reason for assigning little weight to a treating physician's opinion.  *See Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The ALJ need not accept an opinion of a physician—even a treating physician—if it is conclusionary and brief and is unsupported by clinical findings."); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (holding that contradictions between a physician's opinion and a physician's own treatment notes was a clear and convincing reason); *Sylvia Z. v. Saul*, No. ED CV 19-14-PLA, 2019 WL 5394017, at *7 (C.D. Cal. Oct. 22, 2019)

19cv1661-NLS

(finding clear and convincing reasons for rejecting a treating physician's opinion, where the treating physician's opinions were both internally inconsistent and inconsistent with other evidence in the record); *Washington v. Berryhill*, No. 17-CV-07373-VKD, 2019 WL 4221596, at *20 (N.D. Cal. Sept. 5, 2019) (finding conflicts between a treating physician's opinion, treatment notes, and the treatment notes of other medical sources a clear and convincing reason for discounting a treating physician's opinion.); *see also Oberg v. Colvin*, No. EDCV 12-2205 JC, 2013 WL 3306120, at *4 (C.D. Cal. June 28, 2013); *Gibson v. Astrue*, No. 2:11-CV-3330-KJN, 2013 WL 417774, at *7 (E.D. Cal. Jan. 31, 2013).  Here, Dr. Palica's own notes consistently described Plaintiff as "stable," and noted that he had been treated successfully with his medication.  *E.g.*, AR 872.  Starting from her February 2015 evaluation, Dr. Palica reported Plaintiff's status as "stable/unchanged" (AR 855) and at worst, Dr. Palica reported that Plaintiff's state had "mild/mod exacerbation" once in her July 2015 evaluation (AR 844).

Plaintiff cites several portions of the record to contend that Dr. Palica's opinion was consistent with the record, but upon review, these examples are unpersuasive.  For example, Plaintiff cites to a telephone encounter with Dr. Palica, where Dr. Palica recommended scheduling a "crisis" appointment with any available therapist to assess Plaintiff's current symptoms, as support that his symptoms were severe.  AR 868.  But Plaintiff fails to mention that the resulting CCM appointments noted Plaintiff's impairment and severity of symptoms as moderate at worst and showed improvement to "mild" after Plaintiff's first appointment.  AR 852-53, 858, 862.  Furthermore, after three appointments over 3 months, Plaintiff cancelled the CCM appointment stating that "he does not feel he needs them anymore."  AR 851.

Plaintiff also cites to portions of Dr. Palica's treatment notes which describe Plaintiff's affect as inappropriate, he exhibited depressed mood and exhibited disordered thought content.  AR 643, 830, 871, 968.  Plaintiff also emphasizes portions of the record that describe Plaintiff's grooming as fair, his concentration and memory as fair, his insight and judgement as fair, and his recent and remote memory as poor.  AR 674, 852,

19cv1661-NLS

1106, 1129.  Even assuming these are accurate depictions of Plaintiff's limitations, they do not necessarily translate into *severe* limitations as opined by Dr. Palica.  *See Herrick v. Berryhill*, No. 18-CV-01001-DMR, 2019 WL 4674381, at *12 (N.D. Cal. Sept. 25, 2019) (finding that largely normal test results which showed mild impairments did not support a treating physician's conclusion that the claimant had moderate or marked restrictions).

Plaintiff additionally points to an instance in Dr. Tzakis' September 2016 evaluation where he wrote "[n]egative symptoms of schizophrenia *seem* to be interfering with maintaining gainful employment."  AR 968.  But this single comment is not strong enough to foreclose the interpretation that Plaintiff was experiencing a mild to moderate impairment.  First, when read in context, this seems to be an observation of Plaintiff's subjective reports, not an instance of objective evidence supported by clinical findings.  Second, as mentioned before, this does not foreclose the ALJ's reasonable interpretation that Plaintiff was suffering from only a mild to moderate impairment.  *See Batson*, 359 F.3d at 1193 ("When the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.").

Finally, Plaintiff cites to additional evidence submitted to the Appeals Counsel to contend that Dr. Palica's findings were consistent with the record.  In particular, Plaintiff points to a second opinion by Dr. Palica dated December 20, 2018, where she reported that Plaintiff had an episode where he "spackled dozens of holes, or perceived holes, in the wall shared w/ neighbors."  AR 153.  Plaintiff also cites a letter submitted by his mother, which recounts Plaintiff becoming extremely paranoid "about cell phones, computers, and about his neighbors being 'bad' people and spying on him."  AR 189.

The Ninth Circuit distinguishes between additional evidence that is "considered" by the Appeals Council and additional evidence which is "looked at" by the Appeals Council.  Evidence which is "considered" by the Appeals council is incorporated in the administrative record and must be considered when reviewing the Commissioner's final decision for substantial evidence.  *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012).  By contrast, evidence which is "looked at" does not become part of

the record for the purposes of our review.  *Amor v. Berryhill*, 743 F. App'x 145, 146 (9th Cir. 2018).  The fact that evidence which has been "looked at" has been included in the administrative record, does not mean that the Court is required to review the evidence for the purposes of a substantial-evidence review.  *See Rebecca E. v. Saul*, No. 2:19-CV-00314-MKD, 2020 WL 1878738, at *5 (E.D. Wash. Apr. 15, 2020) ("Pursuant to agency policy, a copy of evidence not meeting the criteria and therefore not considered by the Appeals Council is nonetheless included as part of the certified administrative record filed with this Court, *although by law, the rejected evidence falls outside the scope of the Court's substantial-evidence review*.") (emphasis added).

Here Dr. Palica's second letter is outside the scope of review because it was not considered by the Appeals Council.  The letter was dated December 20, 2018.  AR 2.  In denying Plaintiff's request for review, the Appeals Council determined that Dr. Palica's letter "[did] not relate to the period at issue" and therefore it did not affect the decision as to whether Plaintiff was disabled up to the date of the ALJ's decision, October 22, 2018.  AR 2.  Upon review of the record, the Court agrees that Dr. Palica's letter did not relate to the relevant period.  Dr. Palica's letter only refers to Plaintiff in the present tense and makes no specific notation to symptoms during the relevant period.  AR 153.  Additionally, the "spackling" incident she cites occurred on "Thanksgiving weekend 11/24," one month after the ALJ's determination.  *Id.*  Accordingly, this incident along with Dr. Palica's second letter is outside the scope of review.  *Sheri R. v. Comm'r of Soc. Sec.*, No. 2:18-CV-00136-MKD, 2019 WL 1586757, at *4 (E.D. Wash. Apr. 12, 2019) (finding that additional evidence submitted to the Appeals Council which did not relate to the relevant period was not incorporated into the administrative record for the Court's substantial-evidence review).  Moreover, Dr. Palica's second opinion is not relevant because it does not relate to the relevant period.  *Lawrence L. v. Saul*, No. C19-5490-MAT, 2020 WL 606494, at *4 (W.D. Wash. Feb. 7, 2020) ("Evidence that post-dates the ALJ's decision and documents the worsening of an impairment that existed during the adjudicated period is not relevant to the adjudicated period.").

1   In terms of the letter submitted by Plaintiff's mother, this was "considered" by the
2   Appeals Council, and therefore subject to review.[3]  But even considering these incidents,
3   they do not contradict the weight of the evidence in the record.  First, there is no
4   comparable instance in the medical record, aside from Plaintiff's early hospitalizations in
5   2011 and 2012 which were later managed with appropriate medication and do not show
6   he experienced these symptoms throughout the relevant time period.  As previously
7   noted, Plaintiff consistently denied experiencing any paranoia, hallucinations, or severe
8   symptoms.  These self-reports are bolstered by objective findings by numerous treating
9   sources, including Dr. Palica, that Plaintiff's condition was at worst moderate.  Second, in
10  analyzing the medical notes up to the end of the relevant period, it is notable that Plaintiff
11  had stabilized after experiencing these symptoms.  While his immediate follow-up with
12  Dr. Palica confirmed that Plaintiff had experienced a relapse in symptoms (AR 120-22),
13  subsequent visits show that his condition stabilized.  AR 129 ("[R]eports 'hiccup in
14  sanity' has resolved.  Appears calm and rational and thought content is reality based.");
15  AR 135 ("Patient reports: Paranoia has resolved and his psychiatric symptoms are stable
16  […]  Denies persistent paranoia and none observed."); AR 144 ("Patient reports:
17  Psychiatric symptoms are stable […] Paranoia: None reported or evident").

18  Finally, even though the ALJ assigned little weight to Dr. Palica's opinion, he still
19  included limitations which were consistent with her findings.  For example, the ALJ

---

[3] The Appeals Council found this evidence did not show a reasonable probability that it would change the outcome of the decision and therefore did not exhibit it.  AR 2.  While it may seem that this evidence is not part of the record, the Appeals Council did consider the letter submitted by Plaintiff's mother by determining that the evidence would not have changed the outcome of the case.  *See Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993) ("[A]lthough the Appeals Council 'declined to review' the decision of the ALJ, it reached this ruling after considering the case on the merits; examining the entire record, including the additional material; and concluding that the ALJ's decision was proper and that the additional material failed to 'provide a basis for changing the hearing decision.'"); *see also Reyes v. Comm'r of Soc. Sec. Admin.*, No. CV-17-08192-PCT-SMB, 2019 WL 2098755, at *3 (D. Ariz. May 14, 2019 ) (finding that additional evidence submitted after the ALJ decisions, which was rejected by the Appeals Council because it did not show a reasonable probability of changing the ALJ's decision, was considered by the Appeals Council and therefore part of the record).

19cv1661-NLS

limited Plaintiff to performing "simple, routine, and repetitive tasks," consistent with Dr. Palica's finding that Plaintiff was not significantly limited in his ability to understand and remember very short and simple instructions.  *Compare* AR 25 *with* AR 1137.  Additionally, the RFC limited Plaintiff's ability to interact with the general public and noted that he could only have occasional and brief work-related exchanges, consistent with Dr. Palica's finding that Plaintiff was moderately limited in his ability to interact with the general public and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  *Compare* AR 25 *with* AR 1137-38.  Thus, it is unclear, exactly how crediting Dr. Palica's opinion would change the outcome of the ALJ's decision.

Accordingly, the Court finds that the ALJ provided clear and convincing reasons for rejecting Dr. Palica's opinion supported by substantial evidence in the record.

**B. The VE's error in misidentifying the DOT number associated with Packer was a harmless error**

At the hearing, the VE gave two examples of occupations that an individual with Plaintiff's age, education, and background and with the limitations noted in the RFC could perform.  AR 201-03.  Specifically, the VE noted that an individual with Plaintiff's attributes and RFC could work as a General Office Machine operator (DOT. # 207.685-014) with 266,000 jobs nationally, and a Packer (DOT. # 559.687-014) with 87,000 jobs nationally.  AR 202-03.  Based on the VE's testimony, the ALJ concluded that Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy and was not disabled under the framework of section 204.00 in the Medical-Vocational Guidelines.  AR 30.

Both parties agree that the VE made an error in his testimony by citing the wrong DOT number to the occupation of Packer.  But Plaintiff asserts that this error is a harmful error that warrants remand. In particular, Plaintiff contends that the inconsistency between the VE's testimony and the DOT triggered the ALJ's affirmative duty to inquire and resolve this discrepancy.  Plaintiff reasons that because the ALJ did not inquire into

19cv1661-NLS

this discrepancy, the ALJ violated his affirmative duty.  Additionally, Plaintiff asserts such error was not a harmless error, because the VE's mis-citation rendered his entire testimony unreliable.  The Court disagrees.

"In order to trigger the ALJ's duty to inquire, the conflict between the VE's testimony and the DOT's job description must be 'obvious or apparent.'" *Rodriguez v. Saul*, No. 19CV805-CAB-KSC, 2019 WL 7048774 (S.D. Cal. Dec. 23, 2019).  "This means that the testimony must be at odds with the [DOT's] listing of job requirement that are essential, integral, or expected." *Id.* (quoting *Gutierrez v. Colvin*, 844 F.3d 804, 808 (9th Cir. 2016)).  "Where the ALJ fails to obtain an explanation for and resolve an apparent conflict – even where the VE did not identify the conflict – the ALJ errs." *Id.* (quoting *Thompson v. Colvin*, No. ED CV 13-1851-SP, 2015 WL 1476001, at *3 (C.D. Cal. Mar. 31, 2015)).

Thus, even where an ALJ errs, the Court may not reverse the decision if the error is harmless. *See Molina*, 674 F.3d at 1111.  An ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination.  *Id.* at 1115.  In each case the Court looks at the record as a whole to determine whether the error alters the outcome of the case.  *Id.*  "The relevant inquiry in this context is not whether the ALJ would have made a different decision absent any error, . . . it is whether the ALJ's decision remains legally valid, despite such error." *Carmickle v. Comm'r*, 533 F.3d 1155, 1162 (9th Cir. 2008).

In support of his claim, Plaintiff cites to *Zavalin v. Colvin*, 778 F.3d 842, 848 (9th Cir. 2015) and *Michelle G. v. Berryhill*, Case No.: 18cv1323-DMS (MSB), 2019 WL 3322405, at *21 (S.D. Cal. Jul. 23, 2019), to contend that the ALJ's failure to reconcile the conflict between the DOT and the VE's testimony was a harmful error.  These cases distinguishable for two reasons.  First, the "conflicts" in *Zavalin* and *Michelle G.* involved substantive conflicts between the VE's testimony and the DOT.  In *Zavalin*, the VE testified the plaintiff could perform two occupations which required Level 3 Reasoning, despite the plaintiff's RFC limiting him to simple tasks.  *Zavalin*, 778 F.3d at

844 (9th Cir. 2015).  Likewise, in *Michelle G.*, the VE testified the plaintiff could perform an occupation which required Level 3 Reasoning, despite the plaintiff's RFC limiting her to simple tasks. *Michelle G.*, 2019 WL 3322405, at *9.  Here, as Plaintiff recognizes, "there is not a conflict between the RFC and the job cited by the VE; rather, *the issue is that the VE testified to a job that did not correspond to the D.O.T. number*." ECF No. 17 (emphasis added).  Plaintiff does not actually dispute the substance of the VE's testimony, rather he takes issue with a clerical error made by the VE.  Thus, the ALJ's duty to inquire was not triggered in the first place.

Second, in *Zavalin* and *Michelle G.*, the VE's substantive error impacted all the occupations that the VE testified to.  In *Zavalin*, *both* occupations that the VE testified to substantively conflicted with the plaintiff's RFC.  *Zavalin*, 778 F.3d at 844.  Similarly, in *Michelle G.*, the VE provided only one example which substantively conflicted with the plaintiff's RFC. *Michelle G.*, 2019 WL 3322405, at *9.  Here, notwithstanding the VE's error, substantial evidence supports the ALJ's determination.  Plaintiff acknowledges that the VE testified to *two* possible occupations that he could have performed.  Moreover, each of these occupations was sufficient by itself to support the ALJ's determination, since each qualified as "other work" which existed in significant numbers in the national economy.  Thus, even if this did trigger the ALJ's duty to inquire, such an error would be harmless, because the ALJ's decision would still remain valid notwithstanding the error. *Molina*, 674 F.3d at 1115 ("[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error 'does not negate the validity of the ALJ's ultimate conclusion.'").

Plaintiff does not contend or make any showing that the occupation of general office machine operators is inconsistent with the DOT.  Rather, Plaintiff contends that such error was not harmless, because the VE's error "casts a cloud of unreliability over [the VE's] entire testimony."  The law does not support such a sweeping conclusion.  Under similar circumstances, other courts have refused to render the entire testimony of a VE unreliable due to a small clerical error and held such an error harmless. *Alie v.*

*Berryhill*, No. 4:16 CV 1353 JMB, 2017 WL 2572287 (E.D. Mo. June 14, 2017) (finding that the ALJ's citation to the wrong DOT number was a harmless error, because the plaintiff had not shown the ALJ would have reached a different decision); *Barrett v. Colvin*, No. CV 14-8838 KES, 2015 WL 5796996 (C.D. Cal. Oct. 1, 2015) (holding that the VE's misidentification of the occupation "Packer" by one digit was akin to a typographical error and did not affect the court's analysis); *Carpenter v. Colvin*, No. 214CV00990LDGCWH, 2015 WL 13597925 (D. Nev. June 5, 2015), report and recommendation adopted, No. 214CV00990LDGCWH, 2017 WL 4102451 (D. Nev. Sept. 15, 2017) (finding the VE's misidentification of a DOT number was harmless because the VE identified two other representative positions that Plaintiff could perform).

Accordingly, the Court finds that the ALJ committed a harmless error by relying on the VE's testimony.

## C. The RFC adequately addressed Plaintiff's limitations

Plaintiff's third and fourth argument essentially ask the same question: whether the ALJ's determination of RFC sufficiently accommodated Plaintiff's impairments. Though Plaintiff contends that his argument is distinct from his criticism of the RFC, his argument is undercut by the fact that he consistently references RFC regulations in supporting his fourth argument.[4] Therefore, the Court will analyze whether the RFC sufficiently accommodated Plaintiff's impairments.

While Plaintiff contends that the RFC is insufficient, he does not explain specifically how the RFC is insufficient. Plaintiff only gives a summary of the relevant regulations and repeats the ALJ's findings. Plaintiff emphasizes that the record noted poor memory, erratic moods, and limited insight that affected his concentration and

---

[4] Plaintiff cites to two regulations titled "Your residual functional capacity" to support his argument that the ALJ was required to consider the Plaintiff's ability to sustain work. 20 C.F.R. § 404.1545(c); 416.945(c). Additionally, the regulations Plaintiff cites state: "when we assess your mental abilities, we first ~~fist~~ assess the nature and extent of your mental limitations and restrictions and then determine *your residual functional capacity* for work activity on a regular and continuing basis." *Id.* (emphasis added).

19cv1661-NLS

ability to focus on tasks.  Additionally, Plaintiff highlights the ALJ's finding that he displayed frequent social difficulties with friends and family members in social situations, and his impairment seemed to affect his ability to manage his personal affairs. He then quotes the ALJ's RFC, and concludes the ALJ's own findings support a more limited RFC.  Plaintiff fails to identify what additional limitations should have been included in the RFC and how that would have changed the outcome.

At the hearing, Plaintiff did state that his condition impaired him in two ways. On a cognitive level, Plaintiff asserted that his memory, concentration and ability to focus were impaired by his condition.  AR 200.  On a social level, he asserted that he had difficulty "getting along" and maintaining social relationships.  AR 197-98.

However, the RFC addressed both these limitations.  To address his cognitive difficulties, Plaintiff is limited only to simple, routine, and repetitive tasks with frequent breaks.  AR 25.  Though Plaintiff's memory was noted as poor and limited at times, such limitations are adequately addressed by limiting tasks to simple, routine and repetitive. Additionally, this is consistent with Dr. Palica's opinion, which noted that Plaintiff's ability to understand and remember very short and simple instructions was not significantly limited.  AR  1137.

As for the social component, Plaintiff was limited to avoid interaction with the general public, and limited to only occasional, brief, work-related interactions.  AR 25. This is an extensive limitation on Plaintiff's ability to interact with others and seems to adequately address his social difficulties.  If Plaintiff is facing difficulties due to social interaction, and the RFC significantly limits his ability to interact with others, it is hard to see how the RFC failed to accommodate for Plaintiff's limitations.

Plaintiff also contends that the RFC is insufficient because the ALJ failed to consider his inability to sustain work.  Plaintiff asserts that because the record demonstrated he had been unable sustain work for a long period of time, the ALJ's determination of RFC should have been different in some way.  But the ALJ did consider Plaintiff's inability to sustain work, specifically by creating an RFC designed to

accommodate his limitations.  A claimant must demonstrate *how* their condition has made them unable to sustain work.  *See* 42 U.S.C.A. § 1382c (West) ("an individual shall be considered to be disabled for purposes of this subchapter if he is unable to engage in any substantial gainful activity *by reason of* any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.") (emphasis added).  Here, Plaintiff alleged that his condition impaired his ability to sustain work because of cognitive and social limitations, and the ALJ crafted an RFC which directly and adequately addressed Plaintiff's complaints.

## V.    CONCLUSION

The Court finds that the ALJ's decision to deny Plaintiff's benefits is supported by substantial evidence.  Accordingly, the Court **DENIES** Plaintiff's motion for summary judgment and **GRANTS** Defendant's motion for summary judgement. The administrative law judge's decision is **AFFIRMED**. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff, and to close the docket pursuant to 28 U.S.C. § 636(b) (b)(4)(c)(1).

**IT IS SO ORDERED.**

Dated:  August 10, 2020

Hon. Nita L. Stormes
United States Magistrate Judge

19cv1661-NLS